**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| MARK EDWARD ELLEFSEN, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | No. 3:12-cv-05094-DGK |
| | ) | Crim. No. 07-cr-05015-DGK |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## ORDER DENYING MOTION TO VACATE, SET ASIDE, OR CORRECT JUDGMENT

This case arises out of Movant Mark Ellefsen's ("Movant" or "Ellefsen") conviction for one count of conspiracy to defraud the United States and three counts of aiding and assisting in the preparation of false income tax returns. Pending before the Court is Movant's pro se "Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence Pursuant by a Person in Federal Custody" (Doc. 1).

Movant argues he received ineffective assistance of counsel, and the Government denied his right to confront the witnesses against him by failing to disclose certain documents. Finding that Movant cannot maintain an ineffective assistance of counsel claim because he was not prejudiced by any of trial counsel's alleged errors, and that his other claim is not cognizable because it was previously rejected during his direct appeal, the Court DENIES the motion.

### Factual Background and Procedural History

The following summary draws almost entirely from the Eighth Circuit's decision denying Movant's direct appeal, *United States v. Ellefsen*, 655 F.3d 769, 773-777 (8th Cir. 2011). The summary quotes large sections of this opinion without further attribution.

Brian Ellefsen was an orthopedic surgeon who provided services through a corporation named Southwest Missouri Bone & Joint, Inc. ("SMBJ"). In 1997, Brian[1] hired his brother, Movant Mark Ellefsen, to serve as SMBJ's business manager.

In 1997, the Ellefsens attended a presentation by James Quay ("Quay") about the Aegis Business Trust System, which used domestic and foreign trusts to shelter assets from taxes. Quay explained that the Aegis system was an asset protection device with tax deferral, through which professionals could send their income offshore and defer paying taxes on it until they repatriated the funds back to the United States. Although the income was nominally offshore, participants could access the funds via a credit card.

Following the presentation, the Ellefsens sought advice from L. Michael Stelmacki ("Stelmacki"), a certified public accountant who had assisted Brian with his accounting and taxes since Brian began practicing medicine in the late 1980s. After speaking directly with Quay about the Aegis system, Stelmacki concluded that Quay "was a person to avoid" and urged Brian to consult an independent tax attorney. Brian did not, and in July 1997, the Ellefsens enrolled in the Aegis system.

On July 21, 1997, Stelmacki faxed an article to Mark with a note that read, "Mark, please read this article. I hope that it's not too late for Brian to reconsider." The article reported the IRS's crackdown on abusive trust schemes.

Stelmacki also wrote directly to Brian on August 26, 1997, saying:

> I noticed in your July disbursements an expense to Mr. Jim Quay for $15,000 for professional fees. I am also aware that you have decided to go ahead with the Aegis Company's program to use offshore entities to shield you from Federal and State income taxes. I am writing to you because I am concerned for you and the risks you may inadvertently be taking . . . . While I share your

[1] Because the parties share a last name, for clarity the Court refers to them by their first names.

> interest in reducing your tax burden, I feel that you have the opportunity to build sizable wealth without incurring high risks.
>
> . . .
>
> It seems to me that the promoters are relying on an elaborate chain of complex entities to conceal taxable income. They have concocted a series of transactions to cloak earned taxable income from rendering patient services in Carthage, Missouri into non-reported foreign source income and then arranging to lend or gift the money back to you. I am especially suspicious when I learned that they will provide you with a Visa card to access the money. They have also represented that you will have a power of attorney that will allow you to transfer funds at will. You will be earning the income by performing services and you will be enjoying the benefits of the income. Therefore it is reasonable that the I.R.S. could potentially look through this masquerade and say that it is taxable income to you regardless of the structure.
>
> . . .
>
> I am asking that you consider the worst case scenario in which the I.R.S. takes the position that you are committing tax evasion. They have the power to assess huge penalties and interest, to prosecute you, to ruin your career, and seize your property. Is the risk worth it?

Shortly thereafter, Stelmacki spoke to Mark regarding the letter and his concerns. Following their conversation, Stelmacki believed that the Ellefsens would not proceed with Aegis, and thereafter the Ellefsens did not mention Aegis to Stelmacki.

In August 1997, Brian established the Stekadash Asset Management Trust ("SAMT") and the Southwest Missouri Bone & Joint Trust ("SMBJ Trust") and opened bank accounts in their names. In September, he authorized Aegis to open foreign bank accounts for him. Thereafter, three bank accounts were opened in St. John's, Antigua. One account was in the name Stekadash International Trust, and two were in the name of Stekadash Services Company Ltd. In early October, cashier's checks drawn from SAMT's bank account were deposited into the Stekadash International Trust account.

After establishing the foreign bank accounts, Brian received a credit card which he could use to access the accounts for cash advances and purchases. Aegis explained that the foreign bank had been instructed to transfer funds from the Stekadash International Trust account to the Stekadash Services Company Ltd. account that was used to pay the credit card balance. The third account maintained a $15,000 balance to secure the credit card. Brian could transfer funds from the domestic accounts into the Stekadash International Trust account and ultimately use those funds to pay the monthly balance on the credit card without ever paying taxes on the income.

The Ellefsens also met with Lynn Bell–Osina ("Bell-Osina"), an accountant then-associated with Aegis, and hired her to prepare tax returns for the newly created entities. After the initial meeting, Bell–Osina had no further interactions with Brian; Mark provided the records to prepare the tax returns.

In 1997, SMBJ transferred $107,388 through the Aegis system and recorded the transfers as management fees in its records and on its 1997 corporate tax return. In 1998, SMBJ transferred $199,000 through the Aegis system, again recording the transfers as management fees in its records and on its 1998 corporate tax return. In 1999, SMBJ transferred $175,000 through the same process. On his personal tax returns in 1997 through 1999, Brian declared that he had no interest or authority over any foreign accounts. From 1997 to 1999, Brian used the related credit card mostly for cash advances, but also to purchase lobsters, jewelry, wine, and high-end apparel, among other things.

On March 31, 2000, federal agents executed search warrants at the Aegis offices and Bell–Osina's office. In mid-April 2000, Bell–Osina called Mark and told him that the Internal Revenue Service had had seized her client files, and she had subsequently contacted a tax attorney who explained that the Aegis system was illegal. Bell–Osina told Mark that they

needed to seek alternate tax counsel. Bell–Osina recommended the attorney who had advised her that her clients should amend their tax returns to undo the trust. Mark told Bell–Osina that he was not going to amend the returns.

In July 2000, Aegis mailed a newsletter to its members, detailing a plan to "Drop Off the Radar Screen," by using a new strategy called the Fortress Trust. In December 2000, Brian converted to the new system, establishing Strategic Management Services, LLC ("SMS"). Mark, as its registered agent, opened two bank accounts in the name of SMS in February 2001 at a domestic bank. Brian transferred $300,000 from the SAMT account to an SMS account.

In 2000, SMBJ transferred $650,000 to the Aegis-created entities and deducted the transfers as management fees on its 2000 corporate tax return. On his personal tax returns, Brian again declared that he had no interest or authority over any foreign accounts. As Stelmacki was preparing SMBJ's corporate tax return, he expressed concern regarding the deduction of $650,000 in management fees and requested that Brian represent in writing that the fees were legitimate. Stelmacki sent a representation letter because he wanted to be certain that Brian actually acknowledged that the payment was "an ordinary and necessary expense of business." Stelmacki discussed the representation letter and his concerns over the fees with Mark, and Brian signed and returned the letter.

In 2001, SMBJ recorded an additional $460,000 in management fees. In February 2002, while preparing the 2001 corporate tax return for SMBJ, Stelmacki sent another letter to Brian, in which he stated:

> Again we noted that Southwest Missouri Bone & Joint, Inc. incurred substantial management fees amounting to $460,000. Last year, we asked that you provide us with a representation letter as to the deductibility of those management fees which you provided to us. We are concerned that these expenses will not meet the I.R.S. test as to being ordinary and necessary expenses of the business. It

> is our understanding that your financial consultants have attorneys
> and tax specialists that have advised you that these expenses are
> properly deductible. However, the I.R.S. says that tax preparers
> should suspect that a taxpayer may be involved in a tax shelter that
> the I.R.S. considers abusive if certain factors exist.
>
> . . .
>
> We believe this important matter should command your immediate
> attention. Regarding the Corporation's 2001 tax returns, we are
> unable to proceed in completing the tax returns unless we have an
> opinion from a tax attorney who is not associated with promoting
> or administering the management company or related entities
> indicating that he has reviewed the transactions and concluded they
> are legitimate and deductible. We will also require a
> representation letter from you similar to last year.

Stelmacki enclosed numerous articles regarding abusive trust schemes and the possible criminal ramifications.

In a phone conversation that September, Mark informed Stelmacki that they had hired someone else to prepare their 2001 return and that Brian would not provide further information or seek an outside opinion. SMBJ's 2001 corporate tax return was ultimately prepared by an accountant associated with Aegis and deducted $460,000 in management fees.

In February 2003, Stelmacki sent an IRS press release by facsimile to the Ellefsens. The release listed the "dirty dozen tax scams." The first scam listed was entitled OFFSHORE TRANSACTIONS: "Some people use offshore transactions to avoid paying United States income tax. Use of an offshore credit card, trust or other arrangement to hide or underreport income or to claim false deductions on a federal tax return is illegal." The release mentioned that the IRS was "offering people with improper offshore financial arrangements a chance to make things right." Through April 15, 2003, eligible taxpayers would not face civil fraud and information return penalties. The release warned that a taxpayer "who does not come forward

now, however, will be subject to payment of taxes, interest, penalties and potential criminal prosecution."

In April 2003, SMBJ reported $180,000 in management fees on its 2002 corporate tax return. Those funds were deposited in an SMS bank account, from which Mark wrote checks to pay Brian's personal expenses, including almost $270,000 for the construction of Brian's new home and the purchase of a lake house.

In March 2005, Stelmacki received a federal grand jury subpoena from an IRS agent for records pertaining to Brian and SMBJ When Stelmacki informed Brian that he was under investigation, Brian responded that "he had nothing to hide." In July 2005, Brian retained William Hauser ("Hauser") to review Brian's prior individual and corporate tax filings. Following that review, in December 2005 Hauser filed amended individual tax returns for Brian, adding most of the so-called management fees to his taxable income. In February 2006, Brian remitted $534,675 in additional payment to the IRS. According to Hauser, that amount represented all taxes, penalties, and interest. The SMBJ returns from 1997 to 2002, however, were not amended.

On April 12, 2007, a federal grand jury returned an indictment charging Brian with conspiracy to defraud the United States and three counts of making false income tax returns in 2000, 2001, and 2002. The conspiracy count alleged that from 1997 through 2003, the Ellefsens conspired to divert more than $1.5 million in funds from SMBJ "for the benefit, use and enjoyment of Defendant B. Ellefsen, without paying any taxes on the diverted funds." The indictment also charged Mark with conspiracy and three counts of aiding in the preparation of the false income tax returns.

The case was tried to a jury for eleven days in May 2009. Among other witnesses, the government called IRS revenue agent Sharon Vandenberg to testify as a summary witness.

Vandenberg testified that SMBJ was a schedule C corporation and a personal service corporation, because the income generated off of this corporation was directly from Brian's personal services. Vandenberg testified that SMBJ paid so-called management fees to SMBJ Trust, which in turn transferred the funds to SAMT. Although SMBJ Trust received the management fees, it did not perform any services or pay any expenses, it merely transferred the income. From there, SAMT transferred the funds to an offshore trust, Stekadash International Trust, without paying taxes. The funds were then transferred to Stekadash Services Company, Ltd., another offshore account, and used to pay for Brian's personal expenses. Vandenberg explained that in 2001, the structure changed: SMBJ began paying the management fees to SMS, which paid wages to Mark and the personal expenses of Brian.

To determine SMBJ's tax liability, Vandenberg "collapsed the trust," adjusting the corporation's income to move the income back to where it would have been had the trusts not been in existence. Because SMBJ had treated the management fees as a deduction, that amount should be added back into the corporation's income. The income was then treated as a constructive dividend to Brian, resulting in tax consequences for both the corporation and Brian.

Vandenberg did not mention Brian's amended individual tax returns and additional payments, wherein he had reported the management fee as income and paid income taxes on those amounts. When defense counsel attempted to cross-examine Vandenberg about the amended returns, the district court sustained the government's objection that those returns were beyond the scope of direct examination.

The jury found both Ellefsens guilty on all counts. The Ellefsens then moved for judgment of acquittal or for a new trial, arguing, among other things, that the government withheld material, exculpatory information from them concerning the IRS's treatment of the amended returns. This Court denied the motions, holding that although the Government did not

provide some documents to the Ellefsens before the trial, the documents did not contain any new evidence, and that the information contained in the documents was neither material or exculpatory. The Court subsequently sentenced Movant to fourteen months imprisonment and ordered him to pay $50,000 in restitution.

The Eighth Circuit affirmed the convictions on September 9, 2011. *Ellefsen*, 655 F.3d at 773. On September 30, 2011, the Eighth Circuit issued its mandate on the appeal.

On September 10, 2012, Movant timely filed the pending motion to vacate his conviction under 28 U.S.C. § 2255.

## DISCUSSION

### I. Movant's claims are meritless.

#### A. Movant's ineffective assistance of counsel claim is without merit.

Movant's first claim is that he received ineffective assistance of trial counsel. He contends trial counsel erred by: (1) not knowing the significance of certain documents in the case and failing to introduce documents that would have been beneficial to his case; (2) failing to retain a separate certified public accountant, instead relying on the accountant retained by his co-defendant brother; (3) failing to argue that he was not an Aegis client, did not have a financial gain in Brian involvement in the trust scheme, and that at one point he had contacted the Illinois Attorney General to inquire about the Aegis Company; (4) not using an IRS memorandum of interview to impeach Lynn Bell-Osina during cross-examination; (5) failing to introduce evidence that Aegis conducted continuing legal education ("CLE") seminars; (6) not raising the affirmative defenses of collateral estoppel and res judicata; and (7) not calling Special Agent Timothy Arsenault as a witness.

To succeed on a claim of ineffective assistance of counsel, a movant must show that "(1) trial counsel's performance was so deficient as to fall below an objective standard of the

customary skill and diligence displayed by a reasonably competent attorney, and (2) trial counsel's deficient performance prejudiced the defense." *Armstrong v. Kemna*, 534 F.3d 857, 863 (8th Cir. 2008) (citing *Strickland v. Washington*, 466 U.S. 668, 687-94 (1984)). Judicial review of trial counsel's performance is highly deferential, "indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional judgment." *Middleton v. Roper*, 455 F.3d 838, 846 (8th Cir. 2006). Trial counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Strategic choices made in the shadow of a lack of preparation or investigation, however, are not protected by the same presumption. *Armstrong*, 534 F.3d at 864.

To establish prejudice, a movant must show that the outcome would have been different had counsel's performance not been deficient. If the movant cannot show a reasonable probability that the outcome would have been different, he cannot show prejudice. *DeRoo v. United States*, 223 F.3d 919, 925 (8th Cir. 2000). Failure to satisfy either prong is fatal to the claim, and the court need not reach the performance prong if the defendant suffered no prejudice from the alleged ineffectiveness. *See Pryor v. Norris*, 103 F.3d 710, 713 (8th Cir. 1997).

As a threshold matter, Movant cannot show that trial counsel's performance prejudiced him. As the Eighth Circuit stated, "the evidence against the Ellefsens was overwhelming," and "[t]he record is replete with evidence to support the jury's finding that Brian and Mark acted willfully." *Ellefsen*, 655 F.3d at 781, 782. Assuming for the sake of argument that trial counsel's performance was deficient in some way—a charge that is completely rebutted by the record[2]—none of the alleged errors, either by themselves or in the aggregate, made any

---

[2] The record includes a detailed four-page affidavit from trial counsel. In the affidavit, trial counsel points out that several of the allegations, such as Movant's claim that counsel failed to argue that he did not have a financial gain

difference in the outcome. The alleged errors did not result in the admission of the the most damning evidence against Brian, namely that two credible witnesses, Stelmacki and Bell-Osina, along with the various articles and IRS publications that were shown to him at different times, warned him that the trust scheme he and his brother were using was illegal. Thus, even if trial counsel had not committed any of the alleged errors, the outcome would have been the same, so Movant cannot show any prejudice.

Because Movant cannot show any prejudice, his ineffective assistance of counsel claim fails as a matter of law. *DeRoo*, 223 F.3d at 925.

**B.** **Movant's claim that he was denied his right to confrontation because of perjury and the Government's failure to disclose documents is not cognizable because it was rejected in Movant's direct appeal.**

Movant's second claim, titled "Right of Confrontation – Perjury," reiterates claims Movant raised in his direct appeal. In his Petition, Movant argues

> [d]uring the entire trial the government denied that the IRS ever made an assessment to Brian Ellefsen's amended returns. They were so concerned about Brian Ellefsen's amended returns being assessed that they lied about it during the trial and even withheld documents from the defense concerning the details of the assessments. The fact that the amended returns were assessed is important, but the facts of when, how, and who authorized the assessments are just as important if not more important and the government knew this and that is why they continued to lie.

(Pet. at Ground 2, p. 1.) Movant asserts the lead prosecutor lied to the Court that the amended returns were never assessed by the IRS. Movant contends that if the Government had timely disclosed certain documents to him, he would have been able to identify and call witnesses, such as IRS employee James Lewis and Special Agent Tim Arsenault, who could testify that the

---

from Brian's involvement in the trust, are simply not true. Counsel also notes that several of the decisions, for example, not to introduce certain documents and not to retain a separate accountant, were strategic decisions made after consulting Brian.

amended returns had been assessed. Therefore, because the government did not timely disclose these documents, he was denied his ability to confront the witnesses against him.

The Eighth Circuit, however, already rejected this and related claims in Movant's direct appeal, a fact which is fatal to this claim. In his direct appeal, Movant argued that: (1) the Government wrongly suppressed evidence related to the IRS's assessment of the amended tax returns, presented perjured testimony from Sharon Vandenberg, and then lied about these actions to the trial court; (2) the wrongfully suppressed evidence shows the IRS agreed with Brian Ellefsen's tax liabilities as reported on his amended tax returns; and (3) these matters were material to the trial's outcome. *Ellefsen*, 655 F.3d at 777-782; Defs.' Joint Reply (Doc. 242). The Eighth Circuit found no merit to these claims and affirmed the denial of Movant's motions for judgment of acquittal or new trial. *Ellefsen*, 655 F.3d at 777-782.

Because the Eighth Circuit denied these claims in Movant's direct appeal, the Court may not revisit these issues in a § 2255 motion absent an intervening change in controlling authority. *Sun Bear v. United States*, 644 F.3d 700, 702 (8th Cir. 2011). Consequently, Movant's second claim is not cognizable here.

## II.    No evidentiary hearing is required.

"A petitioner is entitled to an evidentiary hearing on a section 2255 motion unless the motion and the files and records of the case conclusively show that he is entitled to no relief." *Anjulo-Lopez v. United States*, 541 F.3d 814, 817 (8th Cir. 2008) (internal quotation marks omitted). "No hearing is required, however, 'where the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based.'" *Id*. (quoting *Watson v. United States*, 493 F.3d 960, 963 (8th Cir. 2007)); *see also Sanders v. United States*, 347 F.3d 720, 721 (8th Cir. 2003) (holding a § 2255 motion may be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle him to relief, or (2) the allegations

cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact).

As discussed above, Movant's claims are not cognizable, procedurally defaulted, or conclusively contradicted by the record. Consequently, no evidentiary hearing is required.

**III.     No certificate of appealability should be issued.**

In order to appeal an adverse decision on a § 2255 motion, a movant must first obtain a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1)(B). District courts customarily address this issue contemporaneously with the order on the motion. *See Pulliam v. United States*, No. 10-3449-CV-S-ODS, 2011 WL 6339840, at *4 (W.D. Mo. Dec. 16, 2011).

A certificate of appealability should be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requires the movant to demonstrate "that reasonable jurists could debate whether (or for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 464 U.S. 800, 893 n.4 (1983)). In the present case, the Court holds no reasonable jurist would grant this § 2255 motion, and so the Court declines to issue a certificate of appealability.

**Conclusion**

For the reasons discussed above, the motion (Doc. 1) is DENIED and the Court declines to issue a certificate of appealability.

**IT IS SO ORDERED.**

Date:   March 24, 2014                          /s/ Greg Kays
                                                GREG KAYS, CHIEF JUDGE
                                                UNITED STATES DISTRICT COURT